Energy Group Please proceed, Ms. Poe. Yes, Your Honor. May it please the Court. This case is a textbook example of the critical importance of this Court's teaching that claim terms must be construed within the entirety of the specification, and that the Board cannot construe claims so broadly as to divorce its constructions from the specification and evidence. Regrettably, that is what happened here, and so the Board's decision should be overturned for at least three alternative, independent reasons. First, no reasonable interpretation of the claim language in the context of the full specification could conclude that the term Second Lockdown Mechanism would be understood by one of ordinary skill in the art to include a setting tool. Every embodiment in the patent depicts a separate, removable setting tool. The specification repeatedly refers to the setting tool being removed, and it identifies separate, third-party setting tools that could be used in conjunction with the claimed invention. Furthermore, the inventor disparaged the prior design with an integrated setting tool because it had, quote-unquote, a high profile, in contrast to the goal of the 053 invention to achieve a, quote-unquote, low profile. The only way to do that is through a separate, removable setting tool, because neither of the challenged claims in this case is anticipated by the prior art, which fails to disclose a lockdown mechanism separate from the setting tool. The Board's decision should be reversed for that reason alone. Second, no reasonable interpretation of Second Lockdown Mechanism in the context of the entire specification could conclude that it permits the exclusive use of hydraulic pressure to lock the mandrel into position. Every embodiment in the patent includes a second lockdown mechanism that uses mechanical locking to lock the mandrel into the operative position. Even in Figure 5, where the hydraulic piston is used to initially stroke the mandrel into position, it is ultimately secured, it is ultimately locked by nut 60 and bolts 56 for mechanical. The abstract itself discloses a, quote-unquote, second mechanical locking mechanism, close quote, which was one of the reasons that the district court construed the claims to require that feature. I know you were trying to get three points out, but each one is a little longer than you're usually supposed to lead with. So let me turn to the issue of the district court's construction and power integration. Yes, Your Honor. Isn't this case distinguishable from power integrations because the district court actually adopted a claim construction that neither party proposed? I mean, you didn't propose this claim construction, did you? We did not propose it in the district court, but Your Honor, I don't think that's a relevant distinction. I think the key point that this court made in power integrations is that particularly in a system where you have the two different standards, that the board has a responsibility to explain why the district court's claim construction, and there's no dispute, we're talking about even if it was adopted by the district court sua sponte, it is the district court's construction. There's no dispute about that. That the board had an obligation at a minimum to explain why that construction does not come within the broadest reasonable interpretation standard. Well, I mean, I thought that that's what the board did. I mean, the board pointed out that it was not proposed by either party. The board actually looked at it, but it didn't accept it, correct? It didn't accept it, but I don't think the board explained, as power integrations requires, why particularly, specifically, the district court's construction did not come within the broadest reasonable interpretation. But I think regardless of power integrations, I think our primary arguments is that the court doesn't even need to reach the power integrations point, because the constructions adopted by the board in this case are simply beyond even the broadest reasonable interpretation standard. But as an alternative, we think at a minimum, the board's decision should be vacated, and it should go back to the board for the board to perform the requisite analysis of power integrations and explain why the district court's construction in this case does not fit within the rubric of the broadest reasonable interpretation, even assuming that's the standard. To respond to Your Honor's question, we don't think the fact that the district court adopted the construction that it did sua sponte allows the board then to not explain where here, as in power integrations, it was critical to the construction. Didn't the board specifically say that part of the problem with the district court's sua sponte construction was it was really just based on the abstract, and that wasn't thorough enough analysis? I don't believe that. Certainly, the board disagreed with our construction. I don't think the board went into the level of detail to explain why it didn't fit within broadest reasonable interpretation. But again, we think the court doesn't need to reach that. We don't believe that's a meaningful distinction between our case and power integrations. And just to hit my third point, I think even if this court were to disagree with us and think that the board's construction passed muster under the broadest reasonable interpretation standard, the board still should be reversed on its resolution of the legal question of enablement in this case. Unrebutted expert testimony established that it would have been, and the phrase is virtually impossible, at the relevant time for one of ordinary skill to make the invention claimed in the 053 patent using the 118 disclosure. What do you rely on in the spec to say that the second lockdown mechanism has to be mechanical? Certainly. In the specification, the specification disparages, I think first and foremost it disparages, a tool that tried to use hydraulic pressure for securing the mandrel in position, explaining that, and this is on JA69, quote, it was less secure. Where are you in the spec? Pardon me, Your Honor. In a column six, less secure than a mechanical lockdown mechanism because it was dependent on maintenance of the hydraulic fluid pressure in the setting tool. JA68, columns three and four, persons in the industry are generally less inclined to endorse or accept a hydraulic lockdown mechanism. What line are you? Thank you. My apologies, Your Honor. I'm at lines nine and ten, eight, nine, ten. Top of column three, yes, Your Honor. And moving down to the end of column three, there exists a need for a lockdown mechanism that provides a broader range of adjustment while ensuring a secure mechanical lockdown for maximum security. So combined with, I think, this disparagement that specifically targets the use of hydraulic pressure and speaks of the need to secure mechanical lockdown for maximum security in addition to the use of mechanical in the specification, sorry, in the abstract, that I think the disparagement in the specification, especially when the specification is viewed in its entirety, forecloses the board's construction as unreasonably divorced from the specification and the record evidence in terms of what one of ordinary skill in the art would understand that to be. I think a key example of the board's sort of cherry picking and not reading the specification in its entirety is the board's reliance at JA-12 on a single sentence in the specification that mandrel 72 is locked down in its operative position by the hydraulic force P2. The board put a lot of stress on that. But the board's analysis impermissibly ignores the sentence that immediately follows that sentence, which clarifies, quote, and this is in column eight, lines 31 through 34, to ensure the mandrel is secured in the operative position, the nuts are turned against the lower flange 54 of the mandrel head 26. Again, to ensure that's the mechanical locking. The specification never even suggests an embodiment in which the mandrel is locked in the operative position using anything other than a mechanical locking mechanism. In that point in the spec, it's nut 60 and lower flange 54. And that's not surprising, again, because the whole point of the invention was to meet the industry's need for a device that would ensure a secure mechanical lockdown for maximum security. And, again, that's at the end of column three in the spec. So we believe if the court agrees with us as to either the construction concerning a setting tool or hydraulic, with respect to second lockdown mechanism, it should reverse outright. Because there's no dispute that under our construction and under the construction adopted by the district court, there is no anticipation in this case as a matter of law. Even if the court were to disagree with us on that point, we believe that the board reversibly erred on enablement. And finally, if the court needs to reach the issue, we also believe that the board erred in denying our motion to amend. The board did not even grapple with the key touchstone of the motion to amend, which is patentability. It said that we didn't sufficiently explain the written support. And the board, I think this isn't a case where the board found an explanation unpersuasive. It simply declined to consider the explanation that was offered. Well, no, they found that the explanation wasn't provided. Well, and our position, Your Honor, is that it was provided, certainly in the chart that was provided. And then even if not there at the hearing, where counsel for oil states narrowed in response to questions, narrowed the submission to respond to that, and the board simply ignored that. So this would be a very different case if the board had said, well, you know, we found the explanation wanting. That's not what happened here. And we think at a minimum that the board has an obligation to confront the explanation and the reasoning that was offered. And I'll save the rest of my time for rebuttal. Very good. Who's going first? Mr. Feldhaus, you're going first. Good morning. I'm pleased to report John Feldhaus for the Appellee Greens Energy Group. Your Honor, we have some foam boards here with mechanical devices. I find it's helpful to have some pictures that my colleagues will be putting up, some foam boards. And I am ceding five minutes of the time to my colleague from the U.S. Patent and Trademark Office. Okay, so I'm going to derail you for a second. They're never helpful. Like, all this fumbling is distracting. And this is just language from the claim. And you've got the same color picture you've got in your brief. Okay, Your Honor. It's not. Okay, sorry about that. You should refrain from ever bringing in foam boards. Okay. Ever. All right, sorry, Your Honor. Okay. All right, the first issue, Your Honor, has to do with this idea that the second lockdown mechanism should operate without hydraulic pressure. What the board found, correctly, is that the patent repeatedly talks about hydraulic pressure locking a mandrel in position. The patent in the background, talking about the very prior art that we asserted, says that the hydraulic pressure locks the mandrel in position. Oil States has never really addressed that specific statement in the patent. Well, does it lock it in position, or does it move it into position so that it can be locked? The mandrel is not separable, and the setting tool is used to hydraulically lock the mandrel in an operative position. Your Honor, it says it hydraulically locks the mandrel in an operative position. Similar language is used in Column 8 with respect to the hydraulic cylinder in the device of the patent. The mandrel 72 is locked down in its operative position by the hydraulic force P2. Now, it's true that the patent goes on to say that to ensure that the mandrel is secured in the operative position, nuts 60 are turned down against the flange. But that is to ensure that it's in the operative position, just as the abstract talks about a second mechanical locking mechanism is provided to ensure the mandrel is maintained in the operative position in the event that the hydraulic pressure is lost. And the board also found compelling that there are dependent claims in this very patent that recite exactly that requirement. Claim 10 recites, wherein the second lockdown mechanism comprises a mechanical locking mechanism adapted to ensure the mandrel is maintained in the operative position in the event the fluid pressure is lost. So, Oil States acknowledges that this second locking mechanism of Claim 10 is an optional feature. That is precisely the locking mechanism that they would like to beat into Claim 1. Moreover, Claim number 8 requires that this second lockdown mechanism have a hydraulic cylinder. So, now we have a claim that says the second locking mechanism includes a hydraulic cylinder. And then another dependent claim off of Claim 8 that says that you need a mechanical locking mechanism to ensure that the mandrel is held in place in the event that hydraulic pressure is lost. Precisely what Oil States says needs to be included in Claim 1 is this mechanical locking mechanism that's in the dependent claim. So, there is simply no basis to say that there is any clear unambiguous disclaimer in a patent that talks about hydraulic pressure locking a mandrel in position in a patent where there's a dependent claim that requires precisely the mechanical locking device that they're trying to read into the independent claim. Moreover, Your Honor, the board found compelling that the inventor knew when to use the term mechanical, when to use the term hydraulic, and when not to. Claim 1 specifically does not have any adjective describing the locking mechanism. It simply says a second lockdown mechanism. When the inventor desired to call something mechanical, he knew enough to do so. When he desired to call something hydraulic, he knew enough to do so.  It's broad enough to cover both, Your Honor. Now, the other issue has to do with this setting tool. The setting tool is something that is simply undefined in the patent. The problem occurs in part because the argument that the second lockdown mechanism must be separate from the setting tool never explains what a setting tool is. The district court had that same problem and called this limitation of separate from the setting tool to be unhelpful. And the problem really relates to the fact that the invention in Figure 6 has a hydraulic cylinder. Can you tell me, would you mind moving on? You don't have a lot of time, and I'd like to hear your arguments on enablement, please. The enablement is simply, Your Honor, the background of the patent clearly refers to precisely the same device that Oil State says was not enabled. The 851 patent mentioned in Column 2, JA 67, is the U.S. patent equivalent of the prior art Canadian 118 application. Same disclosure, same device. So whenever we read in the 053 patent a description of the 851 device, that's the prior art device. But the 851 patent itself isn't prior art. No, the 851 patent is not prior art. The 118 Canadian application was never cited to the examiner, but it is prior art. That's acknowledged. The issue is, Your Honor, that the 053 patent in describing the 851 device, the device made according to the 851 patent, says very clearly in addition to locking the mandrel in position with hydraulic pressure, it says that the blowout protector is widely accepted in the industry, and the hydraulic setting tool is very convenient for securing a mandrel of a well tool in the operative position requiring fixed point pack off in the well. So here is the same inventor in 1999 explaining to the U.S. Patent and Trademark Office that this prior device worked very well and was well received in the industry. It wasn't until the litigation that the inventor, who is an employee of oil states, decided that this device never worked. But even his testimony today doesn't support the theory that the prior art patent published application is not enabling. The claim has nothing to do with pressure. It doesn't even have to do with fracking. The inventor, Mr. Dallas, acknowledged that the 851 device worked at low pressure. It held the sand off. Even the testimony that oil states refers to in the October deposition, Mr. Dallas said that he had two tools. Both were used commercially. Both were used in fracking operations. He said they worked fine when the pressures were 3,000 pounds. They kept the sand off of the wellhead. They protected the wellhead. He charged for that. He obviously thought that this second invention of his was an improvement over the prior art. Well, he may have thought it was an improvement, but it doesn't mean that the first invention didn't work. The case law is very clear that the invention doesn't have to work for all purposes. Mr. Dallas's concern seemed to be that if the well pressure went high, that the first tool maybe didn't work as well. Now, it's not really clear that it didn't. The only testimony we have is from Mr. Dallas. There's no corroborating testimony. He's clearly a biased witness. I think our state's council admitted that they looked for a corroborating witness and couldn't find one. So we really don't know at what point that first device- What was the precise finding of the board regarding enablement? What did it articulate? What did it base its decision on? Well, it based its decision on a number of factors. One is the statement in the March deposition that the device worked at low pressure. One was an admission by Mr. Dallas that the prior device worked or failed only 50% of the time. And also the statements in the 053 patent about the device working fine and being well accepted in the industry. I believe they also relied on Green's expert, Mr. Shafferford, who said that there would be no problem even designing a device according to the 118 patent that would work at high pressure. It was just a matter of making the cylinder and surfaces large enough to apply the appropriate pressure. If an invention fails 50% of the time, do you think that supports enablement? Absolutely, Your Honor. The case law is absolutely clear that as long as the invention works reasonably well for its intended purpose, and the intended purpose can be what's in the preamble of the claim. Here, the preamble of the claim really repeats the language. The preamble says an apparatus for securing a mandrel of a well tool in an operative position requiring fixed point pack-off. That is exactly what the background of the 053 patent says that the 851 tool was able to do. It's very convenient for securing a mandrel of a well tool in the operative position requiring fixed point pack-off in the well. So here, the inventor in the background is admitting that this prior tool did exactly what claim one requires. Now, you make an argument in your brief that you think that we need to change or hold, if it's not a matter of changing, hold, that printed publications are perceptively enabled. I don't hear you making that argument here. I hear you mostly defending the decision of the board on enablement for this court. Is it really your position that all printed publications, all of them, not the specific one at issue here, ought to be presumptively enabling? Well, consistent with the case law, Your Honor, I think that there are district courts that are extending this court's precedent to find that. I'm out of time, Your Honor. May I answer your question? I don't wish to use up my colleague's time. Okay. I think the issue here, and the only reason I didn't make that argument, I think that it is true that the publication should be presumptively enabled in the prior art, but it's not necessary. All printed publications should be presumptively enabled? That's the way you frame it in your brief, and so I just want to really understand. I understand this is a published application of something that was later issued as a patent, but the idea that all printed publications are presumptively enabled? Well, I think that's an appropriate interpretation of the case law, Your Honor, because the case law does indicate that non-patent publications— Is there anything in our case law that indicates this, or are you only referring to the two district courts? No, no. This is, well, In Re Antorum Media, which is this court's precedent, holds that non-patent publications cited by an examiner are presumptively enabling. So this court has held that non-patent publications cited by an examiner are presumptively enabling. The court has also held that the non-claimed disclosures in U.S. patents are presumptively enabling both in the patent office and in district court. So by analogy, it does seem reasonable that printed publications in other contexts other than just prosecution would be presumptively enabling. Now, we do also clarify that in this particular case, that presumption holds even stronger because we have a Canadian application that's directly corresponding to the 851 patent, which is presumptively enabling. Okay. Thank you. Thank you, Your Honor. May it please the court? Mr. Helm, I'd like the office's view on this legal question of whether or not all printed publications should be deemed presumptively enabling. Well, we did not offer—we didn't interview on that point. We don't have any position on that point as of right now. So that's not something we've weighed in on. The two issues that we weighed in on were the constitutionality issue, and after the opening brief was submitted in this case, this court's decision, MCM, resolved that issue. And I think that issue is now—it's agreed upon by Congress. It's resolved. The second point was to defend the board's actions in the motion to amend. So if you— Yeah, let's talk about the motion to amend. There's been a lot of criticism about the board's strictness as it relates to motions to amend. And so I assume that's why you intervened. You want to try to defend their strictness. But what is it exactly that you wanted them to do in this particular instance to justify the motion? So just to be clear, I think that it's not a fair characterization that the board rejected this on purely procedural grounds because I think the board did look at the substance here, in particular with the written description. What the board did was it looked at the citations and said, we don't think that they're sufficient for these particular claim terms. It wasn't for all of the claim terms. I think it was about two different claim terms, one of which, the wellhead assembly, which doesn't appear anywhere in the specification of a particular claim term. And the board said, you have to give us something more than just a citation, the big parts of the specification, for us to understand how you link up the specification to a term that is admittedly never mentioned in the specification. Part of, I think, the problem with dealing with these motions to amend is that they come at the issue of patentability from the reverse that the court and the patent office is used to, which is that the burden is on the patent owner to prove patentability. So if you turn it around the other way and somebody submitted citations to a piece of prior art with no explanation, no expert testimony, it could be that that would be sufficient, but it's not necessarily sufficient. And if you really wanted to invalidate a pattern, you would really want to explain. At the very least, give explanation, probably give expert testimony. Same thing for the written description issue. And so in this case, the board looked, said, we can't understand how you have written description support, and as a result, you haven't carried your burden. So it was a substantive issue. There's a procedural aspect to it, which is that the rules require them to set forth their support for written description, and I think their position is that set forth means just listing the page and line numbers or the column and line numbers where that support can be found. But if there was any doubt about what that set forth means, the board issued an order in this case saying that may be enough, and certainly in some instances it might be enough, but it's not necessarily enough and did cite to a situation where it wasn't enough. Where does the requirement come from that the patentee has to establish that his amendment would result in patentability? Well, it's the board gets that authority from the statute. We say the board gets that authority from the statute. Are you saying the statute expressly says in order to amend that the patentee would have to establish that this would render his claims patentable, or are you saying the board gets the authority to make up the rules from the statute? Well, the board, it's both, because the board does get the authority to make up the rules. It does give the board that authority. But I think in proxy con, this court held that it was proper for the board to have Rule 4220, which puts the burden on the person seeking the amendment. In this case, it's an amendment seeking the motion, and it's a motion to amend in this case. 4220 gives the proxy con set 4220 is a proper exercise of the board's authority and applied it to a motion to amend, and in that case they said, yes, this is absolutely reasonable for the board to do. There's nothing arbitrary about the board's decision. In that case, though, there was no discussion of what the nature of that burden is. It's simply that the person who wants to amend has to explain why that amendment would be patentable. But how far do they have to go? I mean, are you saying that every time, every proposed amendment, you have to define every term used in the claim? I think that proxy con, at the very least, stands for proposition that the requirements laid out by the board in idle free were reasonable. And the board, in this case, pointed to idle free as setting forth the requirements they have. In particular, the portion of idle free that was endorsed by the proxy con case was the determination of patentability with respect to the prior art of anticipation of business. And so it's a pretty straightforward application of the law. If you want to understand what infringes or what anticipates or what's rendered obvious, you have to have a claim construction. Maybe not every single term needs to be construed. That may very well be that some terms just have their plain meaning. They don't need a proper claim construction. But the board, in this case, pointed to claims in terms that it thought did need to be construed, particularly in light of the district court's previous articulation that it thought that at least some of these terms were ambiguous is what it called them. This was when they sought to insert the term into a claim construction. And did the patentee have an opportunity to respond to that? If the patentee has the burden of in order to secure an amendment, it can't predict necessarily what complaints the board is going to have, like the ambiguity of the claim term. So once the board pointed out the ambiguity, did the patentee have an opportunity to explain to the board those issues in order to try to secure amendment? Well, I think that it's fair to say that they were aware of that ambiguity because their own expert – there was a dispute between the experts in this case about whether there was a meaning. And I think their experts said something. But my question was a yes or no question, Mr. Helm. Did the patentee have an opportunity to respond to the board having raised that certain claim terms weren't clearly defined? Is there in the procedures within the PTO an opportunity for a patentee to offer a response? Well, certainly they can offer a response in the papers. They can offer a response at the hearing. And they certainly took advantage of offering a response at the hearing when they tried to give further explanation. I guess narrowing is part of it. There was a hearing to decide whether they should be allowed to amend? Yes. They made arguments about their motion to amend at the hearing, yes. I see my time is up. Briefly, Your Honors, just two points, and I promise I'll go through them more quickly this time. The first, my friend referred to the lack of a definition of a setting toll. I'd like to point the Court to the bottom of Column 9, top of Claim 10, in the patent itself, where it defines a setting toll as a device for inserting the mandrel through the wellhead into proximity of the operative position. Secondly, I'd like to respond to my friend's argument concerning whether the toll worked. And I think the critical question here is whether the toll worked as required by the claims of the 053 patent. And the inventor's testimony on this in his deposition was undisputed, that it did not lock at all, not one single time, not under low pressure, not even in a vacuum. And let me provide some sites for that. That's JA 897, 960 through 61, and 990 through 91. So again, the question isn't whether it worked. It's whether it functioned as required by the claims of the patent. And the inventor's testimony was undisputed, that not even at low pressure, it did not lock.  And so for all of those reasons, we would request that the court reverse and render, or at the least vacate and remand, for the board to apply the proper legal analysis in the first instance. If there are no further questions. Thank you, Your Honors. Thank you, all counsel, for their argument. The case is taken under fire.